FREDERICKA HOMBERG WICKER, Judge.
 

 |2In this criminal proceeding the defendant/appellant Brian Ridgley timely appeals his two armed robbery convictions and his 25-year concurrent sentences. He assigns as errors the trial judge’s failure to conduct a Prieur
 
 [1]
 
 hearing; the erroneous admission of other crimes evidence; the trial judge’s failure to declare a mistrial; and, the excessiveness of his sentences. For the reasons that follow, we affirm the convictions and sentences.
 

 Procedural History
 

 Mr. Ridgley was charged by Bill of Information with two counts of armed robbery, in violation of La.R.S. 14:64. Count 1 charged him with committing armed robbery of Mary Crawford and Deborah Bourgeois on July 11, 2005. Count 2 charged him with committing armed rob
 
 *692
 
 bery of Leeresa P. Maxwell on July 1, 2005.
 
 [2]
 

 |sA twelve-person unanimous jury found Mr. Ridgley guilty on both counts as charged. On May 12, 2008, the day of sentencing, Mr. Ridgley filed a motion in arrest of judgment or alternative motion for new trial. The trial judge denied the motion that date. Defense counsel informed the court that Mr. Ridgley was ready for sentencing and he would waive all delays associated with the post-trial motion. Thereafter, the trial judge sentenced Mr. Ridgley to 25 years at hard labor on each count to run concurrently. Next, defense counsel filed and argued a motion to reconsider sentences, which the trial judge denied. This timely appeal followed.
 

 Trial
 

 Two armed robberies occurred on July 1 and 11, 2005. Each took place at a Check Into Cash center, a short-term payday loan company. The first occurred in Harahan and the second occurred in Westwego. Two days after the Westwego robbery, an individual acted suspiciously at a third Check Into Cash in St. Bernard Parish. The suspicious behavior prompted the employee to alert the police. Information gained from the third incident, together with information from the robbery investigations, led to the defendant’s identification as the robber.
 

 Leeresa Maxwell testified that on July 1, 2005 she was employed at the Harahan Check Into Cash. A man entered and inquired about making a loan. Ms. Maxwell gave the man an application and looked down. When she looked up, the man pointed a black revolver-type gun at her and asked her for the money. He looked in the cash registers, retrieved money, and left the business.
 

 The police responded to her call. She told the police that the subject wore a black hat, a light-colored shirt, and khaki-looking light-colored pants.
 

 Sergeant John Carroll, a supervisor with the Jefferson Parish Sheriffs Office in the armed robbery division, testified that he investigated the Harahan armed robbery. Ms. Maxwell described the robber as a black male armed with a handgun. |4She related that he had a white long sleeved dress-type shirt and khaki or beige cream colored pants and a baseball cap. The suspect was approximately five feet seven to five feet ten and weighed 180 to two hundred pounds. He was 26 to 28 years old.
 

 Later, Sergeant Carroll recovered clothing from the defendant’s vehicle and residence pursuant to a consent search. The police found shirts at the residence that matched the descriptions of the robber’s shirts in the two robberies. Sergeant Carroll recovered two baseball caps, and two pairs of khaki or beige pants from the vehicle.
 

 Ms. Maxwell positively identified the pants and shirt shown to her at trial as being “exactly like” the robber’s.
 

 On July 13, 2005, Ms. Maxwell identified the defendant in the photographic lineup
 
 *693
 
 as the person who robbed her. She also identified the defendant in court. She explained that the store was well-lit. She said that she also noted that the defendant had pointy features and one of his eyes was a little different from the other one. It was like a “lazy eye.” She was positive that the defendant was the person who robbed her.
 
 [3]
 

 Deborah Bourgeois testified that on July 11, 2005 she was employed at the Westwe-go branch of check into cash. A man entered and inquired about the information he needed for a loan. She explained the requirements. He reached into his pocket and then said he would return. He left the premises saying that he was going to get his papers from the car. Ms. Bourgeois thought that the behavior | Swas strange because the man had no papers on him. Usually, people present some information. While this man was gone, she alerted Mary Crawford, her supervisor. A few minutes later, the man returned.
 

 He placed a piece of paper on the counter. When she reached for it, however, he retrieved it and presented a short black gun. He told her this was a robbery and asked her to put her hands up. She feared for her life.
 

 The man went behind a counter. While he held the gun in his right hand, he searched through the drawers with his left. Then, he went behind her to Ms. Crawford, who was sitting at a desk. He demanded money from Ms. Crawford.
 

 Ms. Bourgeois could not see his car although she had a view of the front of the business’ parking lot. Her supervisor alerted the police who arrived immediately thereafter. Ms. Bourgeois gave a physical description of the robber to the police telling them that the robber wore a black cap and a tangerine-colored shirt, which might have been orange and white. She did not recall the pants.
 

 A couple of days after the robbery, Ms. Bourgeois made a positive identification of the defendant from a photo array shown to her. During her testimony, Ms. Bourgeois was shown the surveillance tape of the robbery.
 
 [4]
 
 She also made a positive in-court identification of the defendant, testifying that she had a good look at the robber and she was “100 per cent sure” of her identification. Ms. Bourgeois was not aware of the exact amount of cash that was taken in the robbery.
 

 Once the incident was over, the robber fled toward the left side of the building. The left side is an open area, which is across from a grocery store.
 

 1 fiMs. Crawford corroborated Ms. Bourgeois’ testimony at trial. She testified that the man entered and asked how to go about getting a loan. He was explained how to do so and he asked for an application. He was told that they would give him the application when he gave them his information. He pulled out his wallet. From her desk, she could see that there was nothing in his wallet. He said he was going to go out to get his information and
 
 *694
 
 return. He wore a light-colored shirt with khaki pants and a dark hat. She commented that he came to get a loan but he had nothing in his wallet. When Ms. Bourgeois asked her if she wanted to lock the door, she responded that she would keep her finger on the panic button.
 

 When the man re-entered, she had her finger on the panic button. He entered with papers in his hand. He came to the counter. When Ms. Bourgeois attempted to get the papers, the man pulled a gun out and said “Don’t move. Don’t touch anything.” Ms. Crawford pressed the button quickly and threw it apparently though she did not hold it down long enough.
 

 The man went behind the counter and looked through the drawers. Next, he stood next to her with a gun in his right hand and asked for the rest of the money. Ms. Crawford thought she was going to die. She told him that she did not have any other money because they had just opened.
 

 The man pulled out her desk drawers and told her not to look at him. However, Ms. Crawford looked at his face. He had a medium build and a light complexion. There was something different about his eye. He had a pointy nose and a hat.
 

 He left. When he did, Ms. Crawford pushed the panic button and alerted the police. She gave the police a description. A couple of days later, Ms. Crawford identified the defendant as the robber. She also identified the defendant in court. She was 100 percent certain at trial in her identification.
 

 17Sergeant Kelly Carrigan Jr., a West-wego police officer, testified that he was called to investigate the robbery. The police interviewed Ms. Bourgeois and Ms. Crawford individually. Sergeant Carrigan also canvassed the neighborhood for additional witnesses. Since the victims advised the police that the subject fled in the direction of the 610 Quick Stop Sandwich Shop, he went to that business and spoke to Ray Mire.
 

 Mr. Mire testified at trial that he works at the Quick Stop store, which is a family business. On the day of the Westwego robbery, he saw a person driving a black Lexus run the stop sign and pull into the front of them business. Mr. Mire was looking out the front door, which faces the parking lot. As he looked at the car, he could see the defendant. The defendant backed out and parked his car on the side of Winn-Dixie. The defendant exited his vehicle, put on a baseball cap, and started walking toward the check place.
 

 Mr. Mire was approximately 10 to twelve feet from the defendant. WTile he was watching him, Mr. Mire did not actually see him walk into the check store.
 

 Mr. Mire also testified that while he was watching the car, he noticed duct tape on the car’s mirrors, a missing chrome cap, and “after market” wheels. The police arrived five to 10 minutes after he saw the man he described as a black man.- When the police arrived, Mr. Mire described for them everything he saw, both the man and the car he was driving.
 

 Later, he identified the actual vehicle for the police. He also identified the defendant in a photographic lineup. He was 100 percent certain that the defendant was the person he saw drive his car in front of his family’s business and then move the car over to Winn-Dixie.
 

 At trial, Mr. Mire identified pictures of the vehicle with the duct tape. He also positively identified the defendant in open court.
 

 IsAfter Sergeant Carrigan interviewed Mr. Mire, the police went to the office and researched police reports. They learned that the modus operandi that was used in
 
 *695
 
 Westwego was almost identical to the robbery that occurred days before in Jefferson Parish at another Check Into Cash business. They contacted Detective Carroll and together they compiled them information to search for the next lead.
 

 The next lead occurred at a St. Bernard Parish Check Into Cash store. The police were able to speak to a regional representative of the business. The police learned that a person in a vehicle matching the suspect’s vehicle attempted to obtain a loan at the St. Bernard store. He had the same modus operandi. He left the store to go back to his car to get identification or some information and then attempted to re-enter the store. But, the employee locked the door and notified the police. Before he left the store to get his information from the car, the subject left his work check stub on the counter of that business. There was no robbery or crime committed at the St. Bernard store and therefore the police did not write a formal report.
 

 Since Patrice Luter at the St. Bernard store had written down the license plate number on the Lexus parked in front of her store, Sergeant Carrigan was able to determine the vehicle’s license plate. From the check stub and a Department of Motor vehicles check the police learned that Mr. Ridgley owned a Lexus GS 300. The check stub was from Cisco foods. At this point, the police had the identification of Mr. Ridgley.
 

 The police then determined that the Lexus was in the Cisco parking lot during the evening and assisted Detective Carroll in arresting Mr. Ridgley.
 

 Sergeant Carrigan identified the defendant in court.
 

 Patrice Luter testified regarding the St. Bernard incident. On July 13, 2005, an individual entered the center and said he wanted to apply for a loan. She | ^requested certain documents. The manner in which the man reached for the documents made her feel uncomfortable, She asked him for a recent pay stub, checking account statement, and a valid driver’s license or state identification.
 

 The man then went to his car and returned with a pay stub. The pay stub was made out in the name of Brian Ridgley. Because of her suspicions of the man, Ms. Luter made an excuse to leave the counter. The man left the business, leaving his pay stub on the countertop, but Ms. Luter made a note of his license plate number. At some point, she locked the door. When he could not re-enter, he got in his car and quickly backed up. She noted the license plate number and the make of the vehicle. It was a black Lexus. She called the police and provided a full description of both the man and his vehicle.
 

 No one produced a handgun that day and no money was stolen from her that day.
 

 The defendant waived his constitutional rights and gave a voluntary statement to the police in which he admitted that he had entered the St. Bernard location of Check Into Cash. He stated that he was a regular customer at Check Into Cash but denied being the suspect of the robberies.
 

 At trial, the defendant denied committing the robberies. He admitted that the Lexus with the duct tape was his car. However, he denied being at the Quick Stop that day. He admitted that he had visited the Check into Cash branch in St. Bernard Parish on July 13, 2005. He wanted to obtain a loan. The woman, however, acted strangely. He denied any intent to commit robbery. He believed the positive in-court identifications of the victims resulted from mistaken identity. He was previously convicted of what he thought was misdemeanor unauthorized
 
 *696
 
 use of a movable in 2004 and received a six-month sentence.
 

 |inMary Czubak testified she is employed at Cisco food services as the director of human resources. She was also employed in that capacity in July of 2005. The defendant worked the night shift at Cisco in July 2005.
 

 Other Crimes Evidence
 

 The defendant argues that the trial judge erroneously denied his motion for mistrial based on the introduction of inadmissible evidence of an armed robbery or attempted armed robbery allegedly committed by the defendant in St. Bernard Parish. Furthermore, that evidence of another crime was admitted without proper notice and without hearing and deprived the defendant of his right to a fair trial.
 

 Generally, evidence of other crimes or bad acts committed by a criminal defendant is inadmissible at trial due to the risk of grave prejudice to the defendant.
 
 State v. Williams,
 
 01-1007, p. 7 (La.App. 5 Cir. 2/26/02), 811 So.2d 1026, 1030 (Citation omitted).
 

 Article 404(B)(1) provides:
 

 Except as provided in Article 412 [not applicable here], evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or
 
 transaction
 
 that is the subject of the present proceeding.
 

 La. C.E. art. 404(B)(1) provides an exception, formerly known as
 
 res gestae,
 
 for admission of evidence of other crimes “... when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.”
 

 _Jjjiies
 
 gestae
 
 events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the state could not accurately present its case without reference to them.
 
 State v. Taylor,
 
 01-1638, p. 10 (La.1/14/03), 838 So.2d 729, 741.
 
 cert. denied, Taylor v. Louisiana,
 
 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004). A close connexity between the charged and uncharged conduct is required in order to insure that “the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.”
 
 State v. Colomb,
 
 98-2813, p. 3 (La.10/1/99), 747 So.2d 1074, 1076
 
 {quoting State v. Haarala,
 
 398 So.2d 1093, 1098 (La.1981)).
 

 The
 
 res gestae
 
 doctrine is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime if a continuous chain of events is evident under the circumstances.
 
 State v. Taylor, supra,
 
 01-1638 at 10-11, 838 So.2d at 741 (Citations omitted).
 

 In addition,
 
 res gestae
 
 or integral act evidence incorporates a rule of narrative completeness without which the state’s case would lose its “narrative momentum
 
 *697
 
 and cohesiveness, “with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.’ ”
 
 State v. Taylor, supra,
 
 01-1638 at 11, 838 So.2d at 741-42
 
 (iquoting State v. Colomb,
 
 747 So.2d at 1076
 
 in turn quoting Old Chief v. United States,
 
 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)).
 

 The doctrine of
 
 res gestae
 
 is designed to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.
 
 Id.
 

 | ^Furthermore, other crimes evidence is admissible when offered for such purposes under La.C.E. art. 404(B)(1) as proof of identity.
 
 See also, State v. Prieur,
 
 277 So.2d 126, 129-30 (La.1973).
 
 State v. Prieur
 
 requires notice of intent to use other acts or crimes evidence. The state must show the evidence is not repetitive or cumulative and is not being introduced to show defendant is of bad character.
 
 State v. Cotton,
 
 00-850, p. 12 (La.1/29/01), 778 So.2d 569, 571,
 
 reh’g granted in part for clarification,
 
 00-850 (La.4/20/01), 787 So.2d 278
 
 (relying on State v. Miller,
 
 98-0301 (La.9/9/98), 718 So.2d 960, 962,
 
 explaining
 
 Prieur).
 

 One of the enumerated factors in Article 404(B)(1) must be at issue, have some independent relevance, or be an element of the crime charged in order for the evidence to be admissible.
 
 State v. Hernandez,
 
 98-448, p. 15 (La.App. 5 Cir. 5/19/99), 735 So.2d 888, 897,
 
 writ denied,
 
 98-1688 (La.11/12/99), 750 So.2d 194,
 
 citing State v. Jackson,
 
 625 So.2d 146, 149 (La.1993). Even when allowed under Article 404, the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defense.
 
 State v. Jacobs,
 
 99-991, p. 24 (La.5/15/01), 803 So.2d 933, 951,
 
 cert. denied, Jacobs v. Louisiana,
 
 534 U.S. 1087, 122 S.Ct. 826, 151 L.Ed.2d 707 (2002). The probative value of the extraneous crimes evidence must outweigh its prejudicial effect.
 
 Id., citing La.C.E. art. 403; State v. Hatcher,
 
 372 So.2d 1024, 1033 (La.1979).
 

 The state must show that the defendant committed the other crimes.
 
 State v. Hernandez, supra,
 
 98-448 at 16, 735 So.2d at 898. Hearsay evidence is sufficient to meet the
 
 Prieur
 
 standard for a hearing.
 
 See: State v. Scales,
 
 93-2003, p. 2 (La.5/22/95), 655 So.2d 1326, 1330,
 
 cert. denied, Scales v. Louisiana,
 
 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996) (The trial judge did not err in denying the defendant’s hearsay objection at a pretrial
 
 Prieur
 
 hearing.) and
 
 State v. Brown,
 
 01-230, p. 11 (La.App. 4 cir. 2/28/01), 782 So.2d 136, 144,
 
 writ denied,
 
 01-884 (La.┴6/29/01),13 794 So.2d 811. (The state’s showing may include police reports and prior transcripts.).
 

 No prior notice to the defendant is required for
 
 res gestae
 
 evidence.
 
 See,
 
 La. C.Cr.P. art. 720.
 

 Prieur Notice
 

 At the pretrial suppression hearing, defense counsel questioned an investigating officer about the St. Bernard incident. Then, on the day of trial but before trial proceeded, defense counsel asked the prosecutor if she intended to introduce evidence of Mr. Ridgley’s alleged suspicious action in St. Bernard parish because if so, defense counsel required La.C.CrJP. art. 404(B) notice and none had been provided.
 

 The prosecutor responded that defense counsel had the police report and was aware that no crime had been committed. She argued that the evidence was being introduced as part of the events that led to the identification and the arrest.
 

 Defense counsel stated that according to the police report from St. Bernard Parish,
 
 *698
 
 the reason the police were called was because Mr. Ridgley acted suspiciously in St. Bernard. She argued this was evidence of a bad act within the meaning of La.C.Cr.P. art. 404(B). Ms. Luter did not write down the defendant’s license plate because she thought he was a good person. Rather, she wrote down the license plate because he was doing something suspicious or wrong. She stated that she should have received La.C.Cr.P. art. 404(B) notice if the state was going to introduce the evidence. She argued that according to the police report, Ms. Luter locked the door and became scared. She quoted the report as saying: “Concerned for her safety she locked the business door and hit the holdup alarm button and called 911.”
 

 114The trial judge stated he agreed with the state that the state should not be prevented from introducing the evidence. Later, during the trial he characterized the evidence as integral act evidence.
 

 During opening statements, the prosecutor referred to the St. Bernard incident and Ms. Luter’s feeling uneasy. Defense counsel objected and reurged her objection to the prosecutor’s referring to that incident. She requested a mistrial and the trial judge denied the motion. After Sergeant Carrigan testified regarding the St. Bernard incident, defense counsel noted her objection to the reference to the St. Bernard incident based on her prior reasons.
 

 Even if the evidence of the St. Bernard incident qualifies as
 
 res gestae
 
 or integral act evidence, for which no
 
 Prieur
 
 hearing was required, the defendant effectively had a
 
 Prieur
 
 hearing of the state’s intent to use the evidence of the St. Bernard incident when the trial judge ruled that the evidence was admissible. The hearing and the ruling, however, occurred on the date of trial.
 

 Not every violation of
 
 Prieur
 
 notice requires reversal. Before a defendant can complain of such a violation, he must show prejudice.
 
 State v. Sanders,
 
 93-0001, p. 14 (La.11/30/94), 648 So.2d 1272, 1284, cert.
 
 denied, Sanders v. Louisiana,
 
 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996) (Citations omitted).
 

 Notwithstanding the state’s failure to file a formal
 
 Prieur
 
 notice, the defendant clearly knew that the state would introduce evidence of the St. Bernard incident. Despite the late hearing about the admission of the evidence the defendant makes no showing how his strategy would have been different had he received notice earlier. Because the defendant does not demonstrate prejudice resulting from the state’s untimely notice, he shows no basis for relief under the notice requirements of
 
 Prieur.
 
 Accordingly, the defendant’s claim concerning the l^state’s purportedly insufficient notice that it would introduce the evidence of the St. Bernard incident does not warrant relief.
 

 Admissibility
 

 The defendant argues that evidence of the alleged misconduct in St. Bernard was inadmissible “other crimes” evidence.
 

 In
 
 State v. Taylor, supra,
 
 the Louisiana Supreme Court considered the defendant’s claim that other crimes committed over a seven-day span and involving different victims in different states was improperly admitted. The Court held that “[ajpart from the question of whether the state’s evidence technically qualified as
 
 res gestae
 
 or under the “plan” exception to other crimes evidence in La. C.E. art. 404(B) ... the evidence [in that case] was clearly relevant for purposes other than simply proving the criminal disposition of defendant.” 01-1638 at 13, 838 So.2d at 743.
 

 Similarly, whether the evidence of the St. Bernard incident qualifies as
 
 res gestae
 
 
 *699
 
 or integral act evidence, the evidence was nonetheless admissible. The evidence was admissible for the purpose of rebutting the defendant’s mistaken identity defense and was not being introduced to show that the defendant was of bad character.
 
 See:
 
 Article 404(B)(1) and
 
 State v. Jacobs, supra,
 
 99-991 at 24, 803 So.2d at 933.
 

 Furthermore, its probative value outweighed its prejudicial effect. The defendant ignores the fact that the jury had already received evidence that he was identified as the robber in the two charged offenses. Also, the jury had heard testimony from a police officer that no crime had been committed in St. Bernard Parish. In light of these facts, we fail to discern any significant prejudice to the defendant by having the judgmental label of attempted robber before the jury.
 

 | ^Moreover, even if the evidence were erroneously admitted, the erroneous admission of other crimes evidence is subject to harmless error analysis.
 
 See: State v. Maise,
 
 00-1158, p. 14 (La.1/15/02), 805 So.2d 1141, 1151. Erroneous admission of evidence requires reversal only where there is a reasonable possibility that the evidence might have contributed to the verdict.
 
 State v. Casey,
 
 99-23, p. 13 (La.1/26/00), 775 So.2d 1022, 1033,
 
 cert denied,
 
 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000)
 
 citing Chapman v. California,
 
 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967);
 
 State v. Gibson,
 
 391 So.2d 421 (La.1980). The relevant inquiry is whether the reviewing court may conclude the error was harmless beyond a reasonable doubt ... i.e. was the guilty verdict actually rendered unattributable to the error.
 
 Id.
 

 In this case, the jury had evidence from three robbery victims identifying the defendant as the man who robbed them. Therefore, in light of the overwhelming testimony identifying the defendant as the robber, then, the jury’s verdict was surely unattributable to the testimony regarding the St. Bernard incident, if improperly admitted. Thus, even assuming that the St. Bernard evidence was improper, its admission constitutes harmless error beyond a reasonable doubt.
 

 Ms. hater's Remark
 

 The defendant also complains that the trial judge erred in failing to grant his motion for mistrial following Ms. Luter’s remark that she was about to be robbed.
 

 Ms. Luter testified regarding the St. Bernard Parish incident. At the beginning of her testimony, the prosecutor asked if she recalled that day. She said: “Unfortunately, yes.”
 

 The prosecutor asked: “And why do you recall it?”
 

 Ms. Luter replied: “I recall it because I was about to be robbed and—”
 

 117Pefense counsel objected and moved for a mistrial. She argued that the statement referred to another crime. As such, the evidence was inadmissible and an admonition would be insufficient. Furthermore, she had not received
 
 Prieur
 
 notice or a
 
 Prieur
 
 hearing.
 

 The prosecutor said that she was surprised and sorry that Ms. Luter made that comment. And when the prosecutor spoke to Ms. Luter on the telephone, she expressed to her the need to avoid making any conclusions. The prosecutor also pointed out that there was prior testimony from an officer that there was no crime committed in St. Bernard Parish. She asserted that an admonition that the jury disregard the last statement was sufficient.
 

 In addition, the prosecutor argued that the reference was not a bad act. Rather, it was admissible because it showed the manner in which the police obtained the check stub and identified the defendant.
 

 
 *700
 
 The trial judge denied the motion for mistrial. He found that the testimony was integral act evidence and he felt that an admonition was sufficient. He asked the prosecutor to speak to Ms. Luter and make certain that she avoided inadmissible testimony. The prosecutor agreed to reurge this directive.
 

 The trial judge instructed the jury to disregard Ms. Luter’s last remark. He explained that witnesses cannot give their impressions or feelings because these feelings are unreliable and conclusory. Witnesses might have the wrong impression or feeling. He instructed the jury to only consider the evidence that had been admitted and the testimony.
 

 La.C.Cr.P. art. 770 provides in relevant part:
 

 Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
 

 |1S(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
 

 [[Image here]]
 

 An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
 

 As a general rule, Article 770 does not apply to testimony by a state witness, since a witness is not considered a court official.
 
 State v. Thomas,
 
 08-113, p. 9, 988 So.2d 750, 756. But, the jurisprudence interpreting this article has held that an impermissible reference to another crime deliberately elicited of a witness by the prosecutor would be imputable to the state and would also mandate a mistrial.
 
 State v. Madison,
 
 345 So.2d 485, 494 (La.1977) (Citations omitted).
 

 The remark in question in this case was a reference to an attempted robbery. However, solely through this remark, Ms. Luter did not refer to another crime committed or alleged to have been committed by the defendant. Defense counsel was concerned that since Ms. Luter was describing her interaction with the defendant that day, her testimony gave the impression that it was the defendant who attempted to rob her.
 

 As previously discussed, the defendant had notice that the state intended to call Ms. Luter to testify to the events which led to the identification of the defendant as the robber in the instant offenses. The defendant knew that Ms. Luter would testify regarding the defendant’s suspicious behavior, which prompted her to call the police. Therefore, the defendant had notice that the state would present evidence that suggested an attempt at robbery.
 

 Unsolicited and unresponsive testimony is not chargeable against the state to provide a ground for mandatory reversal of a conviction.
 
 State v. Fowlkes,
 
 352 So.2d 208, 212 (La.1977). In this case, the prosecutor asked a broad, vague | ^question of why Ms. Luter recalled that day. She did not ask if there was a robbery attempt. We cannot find that the reference to another crime was deliberately obtained by design of the prosecutor to prejudice the rights of the defendant. Consequently, La.C.Cr.P. art. 770 does not mandate a mistrial.
 

 The defendant also argues that the trial judge erred in failing to exercise his dis
 
 *701
 
 cretion to grant the motion for mistrial pursuant to La.C.Cr.P. art. 775.
 

 Article 775 provides in relevant part:
 

 A mistrial may be ordered, and in a jury case the jury dismissed, when:
 

 Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
 

 The defendant asserts that he was unfairly prejudiced by the reference to an attempted robbery. The defendant ignores the fact that the jury had already received evidence that he was identified as the robber in the two charged offenses. Also, the jury had heard testimony from a police officer that no crime had been committed in St. Bernard Parish. In light of these facts, we fail to discern any significant prejudice to the defendant by having the judgmental label of attempted robber before the jury.
 

 Excessive Sentences
 

 The defendant was sentenced to 25-year concurrent sentences on the two counts of armed robbery. The offense of armed robbery, La.R.S. 14:64(B), mandates that a defendant be imprisoned at hard labor for not less than ten nor more than 99 years, without benefit of parole, probation or suspension of sentence. The trial judge did not impose the statutory restrictions. However, the trial court’s Igpfailure to impose the sentences without benefit of parole, probation or suspension of sentence will be automatically corrected by operation of La.R.S. 15:301.1(A).
 
 [5]
 

 On appeal, the defendant argues that his two concurrent twenty-five year sentences for the armed robbery convictions, which are without benefit of parole, probation or suspension of sentences, are constitutionally excessive. Furthermore, the armed robberies are crimes of violence.
 
 See:
 
 La. R.S. 14:2(B)(21). As such, the defendant argues that he will have to serve a full 85% of the sentences.
 
 [6]
 

 Specifically, the defendant asserts that he should receive the minimum 10-year sentence based on the following: (1) He is a first felony offender. (2) At the time of sentencing he was about 42 years old,
 
 [7]
 
 steadily employed, and contributing to the support of his two children ages two and seven. (3) There is virtually no likelihood
 
 *702
 
 that he will commit another offense.
 
 [8]
 

 In the proceedings below, the defendant filed a motion to reconsider sentences, which the trial judge denied. He argued that his sentences were constitutionally excessive. He asserted the following mitigating circumstances: (1) l21He was a first offender. (2) He did not commit any acts of physical violence on the victims. (3) He cooperated with the police.
 

 Both the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered constitutionally excessive, even when it is within the statutory range, if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering.
 
 State v. Pearson,
 
 07-332, p. 15 (La.App. 5 Cm 12/27/07), 975 So.2d 646, 655 (Citation omitted).
 

 In reviewing a sentence for ex-cessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court’s sense of justice.
 
 Id.,
 
 07-332 at 15, 975 So.2d at 655-56. The trial court is afforded wide discretion in determining sentences and a court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed.
 
 Id.
 
 (Citation omitted).
 

 In reviewing a trial court’s sentencing discretion, three factors will be considered: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts.
 
 State v. Pearson,
 
 07-332 at 15-16, 975 So.2d at 655 (Citation omitted).
 

 In this case, the defendant’s sentencing exposure was 10 to 99 years on each count. Thus, his 25-year sentences were near the lower end of the scale. The Louisiana Supreme Court held that a longer sentence, which is within the 35 to 50-year range, is acceptable for first offenders convicted of armed robbery.
 
 State v. Smith,
 
 01-2574, p. 7 (La.1/14/03), 839 So.2d 1, 4,
 
 citing State v. Thomas,
 
 98-1144, p. 2 (La.10/9/98), 719 So.2d 49, 50;
 
 State v. Augustine,
 
 555 So.2d 1331, 1332 (La.1990) and the cases cited therein.
 

 |.22The defendant in this case, as the charged offenses reveal, was armed during these robberies. He entered places of business and brandished a pistol at three female victims who could have easily been killed. Ms. Crawford testified that she thought she was going to die. Ms. Bourgeois also feared for her life.
 

 Given the factual circumstances of these offenses, and the Louisiana Supreme Court’s acceptance of longer sentences for first offenders convicted of armed robbery, we find that the trial court judge did not abuse his broad sentencing discretion.
 

 
 *703
 
 Error Patent
 

 The defendant requests an error patent review. However, this Court routinely reviews the record for errors patent in accordance with La.C.Cr.P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975);
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5 Cir. 1990) regardless of whether the defendant makes such a request.
 

 As the state points out, the sentencing transcript indicates that the trial judge did not correctly inform Mr. Ridgley of the period in which to file for post-conviction relief. La.C.Cr.P. art. 930.8(A) states that a defendant has two years after the judgment of conviction and sentence has become final to file for post-conviction relief. In this case, the trial judge informed the defendant that he had “two years to file for post-conviction relief’ without informing him that the two years was “after the judgment of conviction and sentence has become final.” The failure to advise a defendant that the prescriptive period runs from the time his conviction and sentence become final renders the ad-visal incomplete.
 
 State v. Rose,
 
 05-770, p. 11 (La.App. 5 Cir. 2/27/06), 924 So.2d 1107, 1112,
 
 writ denied,
 
 06-1286 (La.11/22/06), 942 So.2d 554. In the past, this court has ordered the trial court to properly advise defendant of the prescriptive period under La.C.Cr.P. art. 930.8 by written notice within ten days of the rendition of this court’s opinion and hsthen to file written proof in the record that the defendant received the notice. However, in
 
 State v. Davenport,
 
 08-463 (La.App. 5 Cir. 11/25/08), 2 So.3d 445
 
 (citing, State v. Morns,
 
 40,322, pp. 4-5 (La.App. 2 Cir. 1/25/06), 920 So.2d 359, 363), we corrected this error patent by way of our opinion rather than a remand. In accord with
 
 Davenport,
 
 we advise the defendant by this opinion, that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.
 

 Accordingly, for the reasons set forth herein, we affirm defendant’s convictions and sentences.
 

 CONVICTIONS AND SENTENCES AFFIRMED.
 

 [1]
 

 .
 
 State v. Prieur,
 
 277 So.2d 126 (La.1973).
 

 [2]
 

 . On the date of trial, January 28, 2008, before trial commenced, the trial judge allowed the prosecutor to amend the bill to correct the dates in the original bill from July 13 to July 11 in Count 1 and from July 11 to July 1 in Count 2. The court also allowed the prosecutor to amend Count 1 by adding Deborah Bourgeois as a victim. Defense counsel, who conferred with Mr. Ridgely, had no objection to the amendments and did not want to continue the trial.
 
 See:
 
 La.C.Cr.P. art. 489 (continuance where amendment is prejudicial). Although Mr. Ridgely was not arraigned on the amended bill, the failure to do so was waived when Mr. Ridgely proceeded to the trial without objecting to the omission. La. C.Cr.P. art. 555. Such waiver is considered as if he had pleaded not guilty.
 
 Id.
 

 [3]
 

 . Ms. Maxwell narrated a video surveillance tape of the event as it was played for the jury. The exhibit was a compilation of the videotapes from each of the robberies. The first portion is of the July 1, 2005 robbery. The second portion is the tape of the other robbery. The tape showed each event three times. Once was fast, second was slow, and third was close up. We have reviewed the videotape and find that it is of poor quality in that it does not clearly show the suspect’s facial features. It does, however, show that the suspect wore a cap and brandished what appears to be a gun. Sergeant Carroll testified that the video was not clear enough to see anyone's face.
 

 [4]
 

 . Ms. Bourgeois testified that the videotape showed that it occurred on July 10th at 11:00 p.m. but that date and time were incorrect.
 

 [5]
 

 .R.S.15:301.1(A) provides:
 

 When a criminal statute requires that all or a portion of a sentence imposed for a violation of that statute be served without benefit of probation, parole, or suspension of sentence, each sentence which is imposed under the provisions of that statute shall be deemed to contain the provisions relating to the service of that sentence without benefit of probation, parole, or suspension of sentence. The failure of a sentencing court to specifically state that all or a portion of the sentence is to be served without benefit of probation, parole, or suspension of sentence shall not in any way affect the statutory requirement that all or a portion of the sentence be served without benefit of probation, parole, or suspension of sentence.
 

 [6]
 

 . The armed robberies would be designated as crimes of violence, which would mandate that the defendant serve eighty-five percent of his sentence before becoming eligible for parole or good time release under La.R.S. 15:574.4(B), which pertinently provides:
 

 Notwithstanding any other provisions of law to the contrary, a person convicted of a crime of violence and not otherwise ineligible for parole shall serve at least eighty-five percent of the sentence imposed, before being eligible for parole.
 

 [7]
 

 . At the time of the arrest, the defendant was 39 years old.
 

 [8]
 

 . The trial judge in sentencing the defendant gave no reasons. The defendant suggests that the trial judge failed to consider mitigating factors because he did not articulate any of the sentencing guidelines provided in La. C.Cr.P. art. 894.1. The defendant, however, failed to raise the objection that the trial judge failed to articulate any Article 894.1 reasons in tire proceedings below. Since the defendant failed to raise the trial judge's compliance with Article 894.1 in the trial court below or in his motion to reconsider sentence, he is precluded from raising this issue on appeal.
 
 State v. Robinson,
 
 07-832, p. 17, n. 8, 984 So.2d 856, 867 (Citation omitted).
 
 See also: State v. Mims,
 
 619 So.2d 1059, 1060 (La.1993) ("Article 881.1 only precludes the defendant from presenting arguments to the court of appeal which were not presented to the trial court at a point in the proceedings when the trial court was in a position to correct the deficiency.”).